May it please the court, I am here representing Western Capital Partners and I'd like to tell a little bit of the background of the case and I'd also like to reserve five minutes. We're pretty familiar with, you know, we may not be familiar with the gory details of everything. The district court judge wrote a, I mean the bankruptcy judge wrote a sixty, eighty-eight page memorandum. And the two, so I might just skip then, Judge, to the two things that I'd like to focus on today. The first one is are the remedies that were afforded to the court because it's a straightforward legal, not straightforward, but it's a legal issue that we can discuss. All right, if we find that Edra's insolvent, does that end everything? I'm sorry? If we find that Edra, well, if we find that Edra was solvent, if we reverse on that point, is, do we have to do anything else? No. If we found that she was solvent then under 548 there would be no fraudulent action, there would be no avoidance. You wouldn't, we wouldn't get to the remedies, right? That's right. So would you like me to start on solvency then? Why don't you start on solvency? It might help. Okay, let's start on solvency. The, on the issue of solvency, the fundamental and overriding error that the court and the expert witness relied on was the wholesale exclusion of certain assets. They excluded and refused to account for all kinds of assets that she owned. There was roughly $440 million of assets and there were $8 million of debts. As I understand it, they separated. Right. And she had, this was community property. Right. And I believe under the law, that's where you can correct me if I'm wrong, at least under California law, and I assume Montana is similar, which is that once there's an official separation, neither spouse is responsible any longer for the debts of the other. Is that right? That's right. The spouse who is incurring the debt cannot encumber the other spouse's community estate. Correct. Okay, and then that, and then once the, and that's a state of affairs, what's going on until there's an actual final dissolution where the court, family law court, would allocate the particular assets and divide, you might have to sell property to turn it into cash and the like. Correct. Okay, so in this case, did the bankruptcy court ignore some assets that were in this status where they could have been reached at the time of this guarantee so that the guarantee was backed by at least what she had as her half of the community property estate, not yet divided officially, but that she could claim as part of hers? This divorce was, there were, there was a first, a mini-settlement that was accomplished in May of 2007, which is a month before the loan closed, which awarded roughly $60-some million to Ms. Blix as a separate property. And then there was a subsequent mini-settlement in September of 2007, which is a couple of months after the loan closed, where more property was awarded. And then the final marital separation agreement was finalized in 2008, in August or September of 2008, at which time all the community property was distributed. But you're not seeking to reach her husband's share of the community property. No. The share in the appendices that we attached, appendices A, we have listed all of the assets, the community assets, and we've shown what her undivided interest was worth. I'm just talking generalization. You don't have to write me the detail. The measurement of solvency does not include his share of the community estate. Well, I think that the other side is contending that because the family law court gave him control over the property during that period of time, that therefore that couldn't be considered in determining whether she was solvent or not. Now, see if they were not, if she wasn't, if there was no bankruptcy court or whatever and people are going to divorce court in California and all of that, a creditor would still be able to lien someone's community property interest, right? I mean, there might have to be things that would occur before it could be released because if the family law court hasn't determined who gets what and all of that, but they still would be able to have access to it, right? Absolutely. The filing of a divorce does not immunize you from some sort of collection effort by a creditor. Your share of the community estate is exposed to creditors, even if you're in a divorce. Well, I guess what I'm going to ask the other side is from this standpoint, if the district court's definition of solvency here were to be upheld, then that would mean that even though you have a lot of assets and you're married, but if you file for divorce and give the other person control of the property, then you couldn't claw back on them? Right. That's exactly, I think, what the opposing side would say. But the Uniform Fraudulent Transfer Act defines what an asset is for purposes of execution and for analysis under the Uniform Fraudulent Transfer Act, and that's all property of the debtor that's not exempt, that's not subject to a valid lien, or not held by tenants in entirety. Those are the only exclusions to what an asset is. What the district court did and the expert was they added to the exclusion. They added any assets that were not producing cash. They added any assets that were not within the control of the debtor, even though she may have a legal or an equitable interest in them. Didn't they also say that were illiquid? Any that were not liquid, that were not immediately. Within a reasonable amount of time. Right. Let me ask you, how does that fit into the analysis? Let's assume that this was an asset, as Judge Callahan said, that the marital, her 50% interest in the marital estate was an asset that should have been considered. Yes. But a lot of this property was all tied up. I mean, there was massive litigation and bankruptcy proceedings, and there were liens here and liens there. Unfortunately, I've had a lot of involvement with the Blixith matters on the bankruptcy side and Mr. Blixith's stuff, and I'm sort of familiar with what's happened. Her ability or a creditor's ability to actually reduce any of those assets, her assets that she would have gotten either through the mini-settlement or the second settlement or the final one, would have been really difficult. I mean, what was available if you had tried to enforce a lien that you could have collected? Well, you could have enforced a lien on any of her share of the community estate. As I say, you're not immune from execution simply because you file a divorce. So didn't the bankruptcy court essentially say that, well, you never would have gotten anything if the creditor wouldn't have gotten anything? You know, I don't know that the court said that, although it may have. I don't think it said that. I feel like what the court did and what the expert did was entirely disregard entire classes of assets and remove them from the analysis. And the expert acknowledged in his opinion that had he included the community estate in his analysis, it could have changed his opinion. And so the analysis was that if it's not producing cash, if it's not readily available, you totally disregard it. And that's not what the Uniform Fraudulent Transfer Act says. I mean, I defined property or asset just a minute ago as being a property of the debtor. Property is defined to be anything that's subject to ownership. Well, this is certainly subject to ownership, her community estate. And then things that are subject to ownership are defined to be all manner of property interests, including rights granted by statute. So the statutory right to community estate is one of the things that's included within the definition of property. In California Family Code by the way. No, I prepared to assume all of that, that it's an asset, that it's reachable, but you could lean it. You could record a judgment. You could record the judgment, the Colorado judgment against property that was coming to her. But there were so many debts on all this property that really it was not worth anything. No, there wasn't. The appendices we've attached to our brief shows that there was only $8 million of her debt. She only had $8 million of debt at the time of the Western Capital Loan. And she had an undisputed $440 million of assets. And the expert disregarded all of that vast wealth simply because it wasn't immediately accessible. And that's not the proper means by which you measure an asset. And the expert, because the expert's reasoning was flawed and the court's reasoning was flawed. Was there a forced execution sale on any of the property? Well, we're measuring her solvency at the time our loan was made, and certainly we weren't executing at the time. But a hypothetical creditor at the time our loan closed would certainly have access to all of her community estate, her share of the community estate. Now, not his. No, I understand that. Yeah. No, not hers. And, as I say, there had been an award made in May, a month before the loan was closed. So at one point, you guys said she was insolvent. Well, let's say, but let's say, I guess, but the flip side, let's say I have a $2 million house. But then I say, but, you know, I call in a realtor and say, we're not moving anything for $2 million. If this, what the district court found here in this case, if that were to stand, would it extend to the fact if I could show that my $2 million house, that nothing was selling, that, therefore, that couldn't be assessed as part of my solvency? We are not talking about valuation. This expert that they had was not a valuation expert. And what he did was exclude the asset altogether. Because you couldn't touch it. Well, because you couldn't touch it because you said that the husband was managing it. But I'm saying, well, if that stands, wouldn't then I be able to go in and say, well, you can't say I have a $2 million asset because I've called someone to say that nothing for $2 million is selling. So, therefore, I'm insolvent. Right. It may be worth $1.8. It might be worth $1.6. It might be worth something. But it's not worth zero, which is the value that was assigned in this case. All of those assets. And in 2007, in June of 2007, we hadn't had the Lehman Brothers collapse. We hadn't had a lot of other things. And the second thing this expert did was fall into the temptation of using hindsight. And his entire opinion was using hindsight to determine solvency. And he looked backwards in his opinion. And you'll see throughout it that he used — everything he used was after the date of our loan. Didn't you at one time, though, say that she was insolvent? I'm sorry? Didn't at one time you say she was insolvent? At one point in time, after the bankruptcy was initiated, an adversary proceeding was commenced that was based on her allegation that she was not paying her debts. And what we did was evaluate the case. And we looked at and confirmed all assets. We conducted 2004 exams of everyone involved and looked to confirm that what was the case. You see, at the time, the loan closed. She signed an affidavit affirming under oath that she was solvent. And then she alleges that she was insolvent later at the time. And so we were reserving the right to pursue this — to deny her discharge in this case. But that was — we resolved that. And we dismissed the case. There was never a finding of a court that would constitute judicial estoppel on that point. Curious. That was it. And I know the court made some conclusion that there was some sort of nefarious reason for it, that it was just some — but it was not. It was not that at all. It was just trying to size up, well, was she being honest or was she not being honest? At the time we closed our loan, we had a letter from her attorney saying that she was worth $500 million. We had a clean credit report from the credit bureau. We had an affidavit signed by her and her son confirming that they were solvent and they were paying their debts. We had an opinion of counsel in Montana give us an opinion of counsel that says that he understood the factual representations in those affidavits were accurate. We had enormous — trappings of enormous wealth. We confirmed the Porcupine Creek property was free and clear and unencumbered and worth $207 million. And we introduced an appraiser at the trial.  And the appraiser confirmed that it was worth $207 million. Now, the district court held that you had waived your defense of claim preclusion to the usury finding and you did not address that determination in your brief to this court. Why should we not conclude that you have waived that defense at the Ninth Circuit? The — I'm not sure. On the usury, we took the position that the district, the Colorado court order, was the instrument that would determine whether there was usury. And, therefore, as a matter of law, it was a Colorado order that was approving interest, and, therefore, it couldn't be usurious. That was our point throughout the case, and we never waived that. Now, the remedies — I wanted to reserve a few minutes. Let me just touch real quickly on the remedies. Because if you look at the court's order, he — he avoids the guarantee only. He does not avoid the security agreement. And at the time this loan closed, we had a promissory note, we had a guarantee, and we had a security agreement. He, the judge, apparently believed that if the guarantee was avoided, then the security agreement is also avoided. But the security agreement encumbers and secures — it secures the note, the promissory note, that was not the subject of the action. So we believe under 550 — or, excuse me, 548, that if there is an avoidance of the obligation, that that's — even if they were to prove that she was insolvent, that all that they have is an avoidance of the obligation. They do not have an avoidance of the security agreement. And even if you were to — Breyer, tied together, though? Wasn't it all bound up? No. 550 specifically says the remedies under 550 are only available if you avoid a transfer. There was no avoidance of a transfer. There was an avoidance of the obligation. And if you read 548 — And the obligation was the guarantee? The obligation is a guarantee. And so in four different places in the court order, it says that the guarantee is avoided. Now, he takes a leap in logic and says, therefore, the security agreement's avoided. But he didn't separately analyze and avoid the transfer. Did they specifically ask to — for an avoidance of the security agreement? Their original pleadings did seek the avoidance of — and I can't remember exactly what they said, but I believe they did include that. But the judge did not separately analyze, nor did it separately award. And if you use his logic that the avoidance of the guarantee will affect the security agreement, then that doesn't give you access to 550 either. 550 is only available if you separately analyze and avoid the transfer. And that did not occur here. And even if it did occur here, the transfer that would have been avoided was the lien interest that was conveyed to Western Capital. It did not acquire fee interest in the property when this loan closed. And what happened was there was a foreclosure of the lien that resulted in fee title being acquired by Western Capital. And under the BFP case that we cited, a Supreme Court case, that transaction, that UCC foreclosure sale, creates absolute reasonable equivalent value. So that UCC foreclosure sale is unassailable. That's the means by which fee title in this property was acquired by Western Capital. If you avoid the lien, then only the portion of the lien that's not been foreclosed is avoided. The lien that's been foreclosed is gone. You can't avoid a lien that's been foreclosed. And they conflate the two. They take the property. They say that, oh, well, we're going to assume that the property was the fee interest in the property. But that ignores this intervening transaction that is the UCC foreclosure sale that's unassailable. I would like to reserve my time. Let me just ask you one question. So if we would agree with you on the solvency issue, does that just result in an outright reversal? Yes. What happens to the usury issue? The usury issue would be a separate analysis altogether. It has nothing to do with solvency or 548. It's a straightforward usury analysis that would be determined as to whether or not the judgment in Colorado was the instrument that was accruing interest and whether we agree with you. If we disagree with you on the insolvency but agree with you on some of the remedies, what's the result? So, yeah, I was going to summarize that in my rebuttal. But, yes, if you were to agree with me on the – if you were to disagree with me on solvency, then we'd remand to the bankruptcy court regarding the remedies because only the guarantee was analyzed and avoided under 548, not the security agreement. Therefore, no remedy could be associated with the security agreement because it wasn't avoided. Instead, the turnover remedies for fee ownership in the property, basically the ones that we've acquired in the foreclosure, should not be subject to the turnover. The money judgment component related to 548 should also be avoided because 548 does not give the court the power to award money damage. Only 550 does. And as I say, you don't get to 550 unless you avoid the transfer. And if the court believes a security agreement could be avoided, then the turnover remedy should be limited just to the lien interests that exist and not those that have been foreclosed. And then we'd vacate the money judgment under 550. And then alternatively, under that 362H analysis, and maybe I'll share with you that in my rebuttal if I should have time. I'll give you a minute. Thank you. Good morning. Good morning. Your Honor, my name – your Honors, my name is Dave Kottner. I'm the attorney for the trustee, Richard Sampson. He apologizes. His flight from Missoula was canceled yesterday and otherwise he'd be here. Hugh McCullough, a lawyer with Davis Wright remains at counsel's table. This court's already properly focused on the issues, which is really what we need to talk about. And I want to talk about this insolvency first because I think the court's very interested in what the tests were. Well, yeah, I have to say I feel like if I asked a kindergarten class whether that person was insolvent with community property interest of $430 million, it just doesn't pass the, you know, the serious test there. It's – and in terms of California law, just because you allow someone to be in charge of maintaining the property, that doesn't mean that that extinguishes the other person's right. There's nothing in that California – you know, the fact that maybe he's the person to manage it, maybe he's the more responsible, maybe he's the one that has the know-how, that doesn't mean that just because the court allows him to manage the property that therefore any community property rights are extinguished. Would you concede that? I'm not arguing that community rights are extinguished. What I'm suggesting to the court is what we're looking at is insolvency. And insolvency is really the global test, three tests, to determine if a creditor – excuse me, if a debtor can repay their debts. That's the goal. And so when you read the cases, when you read the treatises, what they're looking for on this balance sheet test, and there's some definitions that were provided, is really what can you recover from the liquidation of the assets within a reasonable time, and what amount can you reasonably pursue. That's the fairness test. That's why Joe Karas's analysis, the bankruptcy court's analysis, and the district court's analysis is correct. My concern with that whole problem was assuming a creditor could have leaned and then attached and then foreclosed, they could have collected money, right? But they couldn't in California. Why not? Cannot. Why not? Under Section 910, I think it's clear. 910 says if the spouses are separated and a spouse incurs debt while they're separated before the community is divided. It says by negative inference that you can't look to the community assets to You can't look to his assets. Or hers until they're separated. No, it doesn't say that. I think it does say that, Your Honor. I think you're misreading it. Well, I hope not. I don't find that at all a persuasive argument. Well, in the Schenck case they talked about, and they cite this in their favor, the Schenck case, which is a California case, indicates that when a wife, this is an odd case, three years post-divorce, they still have a community asset, a house. Husband doesn't pay child support. Wife wants to collect the child support. She gets a monetary judgment by default. She goes to execute against his half interest in the house. Now, the result in that case was they sent the case to the California family court to get it resolved. They said you couldn't execute. And the wife argued, I'm getting treated differently than a creditor. And in that case, the court said specifically, you're not being treated differently as a creditor. With the complaint that she's placed, and I'm reading from the case, with the complaint that she's placed in a position inferior to that of a third-party creditor, that lacks merit. Even a third-party creditor may be temporarily restrained from seizing property before the court in a disillusion of marriage proceeding if, by doing so, the creditor would frustrate the court's ability to properly dispose of the property. But temporarily, you seem to be taking this to the point that if something is not liquid right at that moment, it can't be counted regarding, it can't be evaluated on the insolvency or solvency issue. That goes where no court has ever gone. I mean, everyone could make something not liquid. I mean. Well, let me give an example. I mean, this goes really far. Well, I don't think so. And first of all, remember, it's one of three tests. But let's, we're talking about balance sheet, because there seems to be no dispute that Ida was not paying her bills as they became due. And if she passes that test, we don't even have to look at the balance sheet test. And there seems to be no question that she lacked capital necessary to manage her problems and bail herself out to trouble. So those two tests are met. And I'll talk about those if we need to. But let's go back to this balance sheet test. Let me give you an example. I'm in Montana. We're not a community property estate. Let's assume I borrow $5 million. And I have $1 million of assets in my name. But I have a limited partnership interest worth $49 million in a family ranch. And my limited partnership interest says you can't sell it, you can't lien it, there's no distributions to that $49 million interest. And then you start looking at the insolvency balance sheet test. Am I solvent? If you include the $49 million asset, the answer would be yes. But insolvency tests something different. Well, but now you're in California, community property state, and she has one-half interest in the community property, which was about $1 billion. But on June 14th, 2007, when this loan was closed, or 15th, excuse me, she did not have the distribution of her separate property. Doesn't have to have a distribution. She had an asset. She had $500, you know, let's assume it's $1 billion just for purposes of discussion. She had a $500,000 asset, her share of the community property. She had no asset on June 15th, Your Honor. I respectfully disagree. Well, at least for purposes of this discussion, you and I might disagree with that. No, and I appreciate that, because I think there's a big difference between how we all think of the answer. My concern is that she had the asset, right? She had various properties make up that $500,000. And the question in my mind is if they had tried to lien it and then execute on the lien, could they really have collected anything? Practically speaking. Practically speaking. The indebtedness, the other liens on the property. I mean, there was so much litigation over all of these Blixith assets. It was incredible. No, and that's a great question, because you talk about Porcupine Creek and Casa Captiva, and they're thrown around in this case. They're owned by a separate entity called Blixith Family Investments. The interest, the community interest, is in that membership interest in Blixith Family Investments, which was owned by Tim until the divorce was resolved. Now, look at those assets. You have to then look at what are the BFI debts within BFI to see if there's any value in those assets. You're precisely right. You can sit there and argue that community property should be in and that it's included, but that requires an analysis of who owns it. Let's take BFI. BFI, let's say they had Porcupine Creek and Casa Captiva. Porcupine Creek ultimately sold for $42 million. Casa Captiva sold for nine. That's $51 million. Do you know what debt they owed to Yellowstone Club? $210 million out of BFI. So you liquidate those assets to pay the creditors of BFI, and there's still nothing. And that's what Joe Karas did when they say he looked forward and backwards. What he did is he said, even after the distribution of the community assets was never solvent. She never could pay her debts as they became due. Well, I'm not sure yet whether or not those assets were reasonably available to be liquidated. I'm sorry. Sorry about that. I'm sorry, Your Honor. Do you have a paper towel? Sorry about that. Thank you. Your Honor, I missed your comment. No, I was only getting you used the term fairness earlier on, right? I used the term fairness? Or fair. Yes. So what I understood you to be saying is that in this circumstance, and I'm going to take it one step further, even if you include the community property asset as an asset, it wouldn't have been fair to the creditor or to your situation, to the estate, because realistically they couldn't have, if they had attempted to foreclose on any of the liens, there's nothing to gain. But I'm not sure about that, because there's nothing. Because the district, what happened here, as I understood it, was they just, as counsel says, they just wiped out this asset as a possibility. Well, they did several things, Your Honor. First of all, the bankruptcy court did say that the community asset should not be included because IDRA could not liquidate them, pledge them, control them, could get no cash from them. That's true. But the bankruptcy court also said, how can a person that has no income and has no business-generating income, that has a lifestyle that is at $2 million a month, pay her debts as they became due? And what the bankruptcy court focused on is, what Jokera said at the time of this particular loan, counting the Western Capital debt, there was $40 million of debt, June 2007. IDRA blicks the files for bankruptcy protection in March of 2009, less than two years later with $165 million of debt. So while we're focusing on balance sheet, there's also two other tests. And I think the one that's clearly in what the court felt most comfortable with is IDRA never could pay her debts as they become due. So what Western Capital will get up and say is, well, she signed an affidavit that said she could. And if she said she could, that's all we need. Well, there's two answers to that. There's cases that are cited in a brief that say it's really the facts and circumstances test and what's reasonable. Could she have reasonably believed that she could pay her debts as they come due? And secondly, we also sued under the UFTA. And if you look under the Uniform Fraudulent Transfer Act, that clearly has a reasonableness test to paying debt. So even if this court said, you know, I don't like that the bankruptcy court and the district court excluded these community assets, that just doesn't seem right. You still get to the conclusion that this debtor is insolvent because she doesn't have adequate cash flow to service her debt. And the court also concluded that she doesn't have reasonable capital in which she can bail herself out. She didn't have any difficulty, even later, in getting other banks to loan her money left and right. She was borrowing money left and right. And what the court properly says, if you're borrowing debt to pay debt, that's not the kind of capital resource you need to pass the inadequate capital test. What was she doing, misrepresenting to these other creditors? You know, Your Honor, I don't know. How was she getting all of these later loans? Your Honor, I don't know how she received the other loans that she received. But if they had looked at her records like we know, none of those creditors should have made a loan. And that's why most of those creditors, if they didn't have security, aren't recovering anything. Did you want to address the remedies? Pardon? The remedy part of this? Yeah, let's talk about remedy for just a second. Because there's this argument presented, and I think it starts with the premise, Judge Kershaw forgot to void all of the transfers. That's not true. You cannot read his decision unless you conclude he voided the guarantee, which is an obligation, he has a right to do that. He can void a lien, which is a transfer, and then he can void all the subsequent transfers to create the remedy. And so Section 550 is clearly the remedy that we elected to pursue under this case. It's the remedy that the court recognized was appropriate. And the examples they use is void the lien, and there's cases they cite too. And one of them was decided by the Ninth Circuit called Taylor. And in Taylor, a car was pledged to secure a bank loan. And by the time the bankruptcy was filed, they had not taken the car and sold the car, a major, major difference with what we have here. What existed was a car with a lien on it. The lien was voidable under Section 547 because it was a preference. And so the court indicated in that situation that the proper remedy is to void the lien, give the vehicle back, and the bank doesn't get their money with respect to the lien that was filed. That's because the lien existed at the time of the action. Here, what we avoided, and the court has a right under 550, is to give you the value of the transfers, and the value of the transfers was determined by what Western Capital either bid or received at the time of sale. That's a fair evaluation process that was used. Or they said with respect to a group of assets that were contracts, transfer those back to the trustee. So despite all the arguments that the remedy argument isn't available to the trustee in this situation, in fact it is. Section 550 clearly says, and there's no question, that the court has the right to give a transfer back of the assets or the value of the assets. And the difference is that the liens had already been foreclosed upon. This argument, which is new today, I don't think I've read it or heard it before, is that somehow under Article 9 when you foreclose, you become absolute guaranteed winner over any fraudulent transfer laws, just not supported. They took the assets. Now, also let's take a look at what the reason for fraudulent transfer laws. This isn't to punish them for intending to take the assets. It's to treat creditors fairly in bankruptcy. Because if someone takes an asset as a result of a fraudulent transfer or a preference, what the court says is the trustee can avoid those claims, and why is that? They avoid the claims for the benefit of all creditors so that they can spread whatever is recovered from those assets between all. And so when the court started its analysis of this case, it did in fact look at each of the insolvency issues, and it concluded for Idra to pay her debts, she needs to be able to liquidate or control assets. I understand the questions that are presented. I believe that's the appropriate test in an insolvency analysis. Do you agree that that is not what the law presently says? I'm sorry? I mean that that's pushing the law from where it presently stands to liquidate and control. I don't find any cases that are exactly on point for you. The case I would rely on are the cases that define properties as something that could be liquidated within a reasonable period of time. She can't liquidate the community assets. She doesn't control them. She doesn't own them. What if hypothetically that divorce went for 10 years? She doesn't pass that test, and in June of 2007, no one knows when she will get those assets. So I think with respect to insolvency, in fact, it's the right test because they also have- And why wouldn't everyone, I mean, but isn't that an incentive for people just to tie up their assets in family law court? Absolutely, and it's endemic on the creditors that are loaning to a person that it's separated to make sure they understand the consequence of loaning when they don't know what that person might ultimately get. And so from the perspective of the balance sheet test, I think the court was right. I think more importantly, though, is look at cash flow because you don't even need to analyze balance sheet if you're troubled by that, if you just look at cash flow. Idra Blixith went from debt to more debt to more debt to more debt. She never, ever was able to increase a surplus. She sold a piece of property for $2.4 million and within a month was out of money. She was given $2 million by her husband a couple of months later, and that money was gone within six weeks. The reason was she didn't have any operations to generate revenue. And when you get to the final test, which is inadequate capital, that's what that court looks to. I did a lot of reading over the weekend to just make sure I understood that inadequate capital test. And what it really is is you could have enough on the balance sheet and you could be paying your bills, and I would suggest to you, Idra was already insolvent in June of 2007, but if you don't have enough income coming in to support your anticipated needs, you have inadequate capital. And if you have inadequate capital, that alone can be a basis to say that a person is insolvent. Is that what the district court did? It based it on all three or did it? You've given us a backup. You said that it could be the adequate capital or cash flow or incurred debts. Correct. Is that what the district court analyzed as well? The district court analyzed all three. Yeah, okay. And they determined, agreed with the court on all three because of the control issue, because the cash flow wasn't sufficient to pay the debt, and that she failed to pass the inadequate capital test. So I would suggest to this court that if it's troubled by this whole idea that community property should be excluded because somehow, someway it should be considered, what that's doing is saying you have a right, you have to be saying that it fits the definition of we have a right to liquidate that asset within a reasonable time and generate money. I don't think you can say that with regard to community assets and especially if those assets are controlled by others. But if that troubles you, look at the cash flow test because the only argument they're going to get up and say is, she signed a document that said I'm paying my bills as they came due. And you know what the best proof is that they don't believe it? Is look at the adversary complaint that you brought up and look at the allegations they're making against Deidre Blixith in that complaint. What they say is she said it, but it wasn't true. They say she said she was solvent, and it isn't true. Western Capital was pursuing that claim to bar the discharge and it wasn't creativity and we did our research and we dismissed it. They filed a motion for summary judgment. That was denied and they were within a week of trial. And you know what changed their mind? Was we filed our adversary that said we agree with you. Deidre was insolvent, now give back the assets so we can all separate those between all the creditors. And what did they do? Within five days they dismissed their complaint. So this isn't a creative new analysis. It's an analysis that said we knew Deidre was insolvent. What did you say about the usury? Usury, Your Honor, was the way it's been raised before this court is very quickly that the Colorado court decided it. That's been properly analyzed by the bankruptcy court and Judge Christensen at the federal district court level. They said, one, they waived the right to raise that defense because they didn't raise it an affirmative defense. But even if they didn't, when they looked at issue preclusion, that issue was not determined by the Colorado court and the court did not preclude us from raising that issue at trial. Okay. Can I ask you a question about this motion you filed? Yes. On substitution or joinder? Thank you. What is that? So what's happened since this went up on appeal? The trustee cut a deal with another party in the bankruptcy to sell our monetary portion of the judgment. So think of the judgment as having two components, the avoidance rights, which gave us back assets, and then we had a monetary judgment, which became the subject of a bankruptcy in Colorado. We're a Class VI creditor, and we deemed it unlikely we would collect it. We sold that for $250,000. So technically, our judgment is held by two parties, the Atizio parties, which purchased the monetary portion of our lien, and the bankruptcy trustee, my client, who continues to own the property that was properly transferred back under Section 550 to the trustee. Do they consent to being joined? Pardon? This Atiago group? I'm sorry. The motion to join this other party? We have asked that they be properly joined as a party to this. Do they consent to that? Yes. Western Capital hadn't had an opportunity to visit with our clients, so they have not consented, but we felt it was appropriate to make sure this Court knew all the appropriate parties. It was joinder, not substitution. Joinder, correct. Okay. Thank you. I'll give you a quick minute for a response. And I apologize for the water. All right. If you want to rebut. If you've got something you want to say. Now's the time. You've got about a minute. Yes. Judge, I wanted to address quickly the Schenck case. The Schenck case, if you look at footnote 2, says, and this is on the community property issue, accordingly it cannot be seriously argued that civil code, the family code, was intended to preclude levy and execution on any undivided community assets to enforce a post-petition debt, thus substantially impairing, but in some cases a creditor's only remedy. Rather, the legislation was intended to ensure that the debt is ultimately collected from the debtor's spouse's estate. So the Schenck case, if you look at that, footnote 2. With respect to the issue about cash flow and about whether she failed that test, the problem is that this refusal to even consider assets permeates all three tests. You can't exclude them and make a conclusion. In fact, the expert acknowledged that at ER 3935 and 3936. He admits that if he had taken into consideration the community property, it could have changed his opinion. And he also confirms that just failing to pay your debts in itself doesn't constitute insolvency. The question here is, and we're not talking about the deference that you would show on an evidentiary issue. We're talking about the wholesale exclusion of assets from the analysis. If the analysis had been done and a conclusion had been reached, then we could understand that there would be deference. But here the error is in exclusion of assets. And the Moody's case on the issue of what you include, says you include lines of credit. You include things like liquidation that you might, money might obtain. And as Mr. Kottner said, she was borrowing money. She borrowed up to $160 million. In June of 2007, when she only had $8 million in debt, she had an enormous resource to use. And she availed herself of it. And she could go to the bankruptcy, or excuse me, the divorce court as she did and ask for additional revenue. She availed herself of that opportunity. I'm red. I'm sorry, Judge. That's okay. That's okay. Are you going to oppose this Joyner motion? It was filed yesterday. Honestly, I haven't even spoken to my client. Am I confused by it? Because it seems to split the baby along the very lines that are the subject of our. You can fire your opposition. Thank you, Judge. All right. Thank you. Thank you, counsel. The matter is submitted. Being recessed now for a while.
judges: Fisher, Paez, Callahan